1998 SD 30

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Jonathan James BONNER, Defendant and Appellant.**

Nos. 19960, 19961.

Supreme Court of South Dakota.

Considered on Briefs Sept. 11, 1997.

Decided April 1, 1998.

Mark Barnett, Attorney General, Paul Cremer, Assistant Attorney General, Pierre, for plaintiff and appellee.

Debra D. Watson of Watson Law Office, Rapid City, for defendant and appellant.

KONENKAMP, Justice.

[¶1.] We are called upon to examine whether imposing the longest possible penitentiary sentence for burglary upon a developmentally disabled offender, whose accomplices received probation, constitutes cruel and unusual punishment. We conclude that under the particular circumstances of this case, the burglary sentence was grossly disproportionate to the offense committed and was thus cruel and unusual under the Eighth Amendment. We reverse and remand for resentencing on the burglary offense. On the other hand, we affirm the sentence for statutory rape.

## FACTS

[¶2.] Jonathan James Bonner, age nineteen, pled guilty to one count of third degree rape, SDCL 22-22-1(5), and one count of second degree burglary, SDCL 22-32-3, and was sentenced to fifteen years on each count with the terms to be served consecutively. Thus, his total sentence was thirty years in the penitentiary. He had no prior felony record and only a few lesser misdemeanors. His first parole eligibility date is in the year 2013, when he is thirty-five.

[¶3.] While Bonner obtained the maximum possible incarceration for his part in the burglary, his two codefendants received quite different sentences before another judge. For the same crime, second degree burglary, Anthony Sorensen got a suspended sentence, a $750 fine, restitution, 160 days in jail with work release, and three years probation. The other codefendant, Tad Patridge, also received a suspended sentence, a $750 fine, restitution, 180 days in jail with work release,

and five years probation. Nothing in the record explains why these sentences were so disparate.

[¶ 4.] To understand the unfortunate circumstances which brought this case to court it is necessary to briefly relate Bonner's childhood and mental health history. Bonner was abandoned by his alcoholic mother at age one, and was raised by his father. He was diagnosed with secondary symptoms of fetal alcohol syndrome (FAS) and primary symptoms of fetal alcohol effect (FAE).[1] People with FAE

> lack bonding and social skills, frequently use poor judgment, lack a conscious awareness of maintaining peer relationships, tend to relate better to adults, lack self-esteem, school performance is low, frequently seek attention inappropriately, lack in attention span development, often act impulsively, tend to be followers, tend to be weak in verbal and auditory learning, and tend to get into social and legal problems due to these deficits.

According to one psychologist who examined him, Bonner "struggles and suffers with all of the characteristics." Beginning at age ten Bonner began receiving psychological counseling with a regimen of prescribed medication to control his behavior. His father was highly skilled in working with him, but found it difficult to stop or modify some of his negative behaviors. In school, he attended mostly special education classes and finally completed the ninth grade at age seventeen, when he quit. He has had no significant work experience since that time.

[¶ 5.] As a juvenile, Bonner was in recurrent trouble with law enforcement in Wyoming who described his violations, though petty, as "atrocious." The authorities were happy to see him move out of Wyoming and dismissed pending matters against him. In South Dakota, Bonner's troublesome behaviors continued. While still a juvenile, he was placed on formal indefinite probation twice for first degree petty theft and disturbance of school. He admitted a delinquency petition charging him with threatening or harassing telephone calls. Yet until the incidents involved in this case, Bonner's entire adult record consisted of first degree petty theft, lighting fireworks within city limits, and no driver's license.

[¶ 6.] In the summer of 1996, Bonner met a fourteen-year-old girl in Rapid City who told him she was about to turn seventeen. When she returned to her home in Huron, she called Bonner every day for a week urging him to come to Huron where they would be boyfriend and girlfriend and she would find him a place to stay and a job. Enraptured, Bonner hastily borrowed money from a friend for a bus ticket. At the terminal, his father begged him not to go—he even tried to physically prevent him from leaving—but local law enforcement officers intervened, allowing Bonner to board the bus because he was an adult.

[¶ 7.] In Huron, Bonner stopped taking his medication and spent the next weeks drinking and partying. During the weekend of July 19–20, 1996, the party moved to the Brodkorb home, where a friend of one of Bonner's companions was house-sitting when the occupants were away on their honeymoon. While there, Bonner broke into a locked box hidden behind the bed in the master bedroom and took two Black Hills gold necklaces, a gold watch, and several $2 bills. The items were locked away because

---

1. Fetal Alcohol Syndrome (FAS) is a pattern of mental and physical defects which develop in some unborn babies when the mother ingests alcohol during pregnancy. Those born with FAS may be seriously handicapped and require a lifetime of special care. Impairments include physical birth defects including mental retardation, growth deficiencies, central nervous system dysfunction, craniofacial abnormalities and behavioral maladjustments. Fetal Alcohol Effect (FAE) is a less severe set of the same symptoms. Experts are not in full agreement on the precise distinctions between FAS and FAE. However, behavioral problems of FAE children can be as severe as those of FAS children. FAS/FAE produces irreversible physical, mental and emotional deficits. Many children with FAS/FAE are not able to understand cause and effect relationships and long-term consequences. In 1991, the Journal of the American Medical Association reported that FAS is the leading known cause of mental retardation. At least 5,000 infants are born each year with FAS, or approximately one out of every 750 live births. Thirty to forty percent of babies whose mothers drink heavily throughout pregnancy have the syndrome. Source: United States Department of Health and Human Services

they were gifts from family for the Brodkorb children. Bonner also took a number of music CDs. Later, after everyone had left, Bonner and his two accomplices returned to the house and took more CDs. He divided the money he had taken earlier with the other two. During the investigation Bonner at first denied involvement and placed the blame on a friend, but then gave a full statement admitting his guilt.

[¶ 8.] Bonner was also investigated in Huron for sexual acts with four girls: J.S., age nine; H.B., thirteen; B.J.P., fourteen; and B.R., sixteen. He was ultimately charged with four counts of rape and two counts of sexual contact with a minor under the age of sixteen. B.J.P., the fourteen-year-old who invited Bonner to Huron, in a written statement to police, said she and Bonner had voluntary sexual intercourse on two occasions. His plea of guilty to third degree rape related to his acts with this girl. All other rape and sexual contact charges were dismissed as part of the plea bargain. No details about the incidents with the other girls can be found in the record. The only facts supporting the rape charge against H.B., the thirteen-year-old, were that he kissed and gave her "hickeys," but she denied any type of "sexual" activity with him.

[¶ 9.] During the legal proceedings, Bonner, at the request of his attorney, underwent a psychiatric examination.[2] Although he was diagnosed with FAS/FAE and mild mental retardation, the psychiatrist concluded Bonner was competent to stand trial.

### ANALYSIS AND DECISION

[¶ 10.] Upon Bonner's plea of guilty to third degree rape and second degree burglary he was sentenced to two consecutive fifteen year penitentiary terms. Each sentence constitutes the maximum penalty for each offense. SDCL 22-32-3, 22-22-1(5), 22-6-1, 22-6-6.1. We take an extremely deferential review of sentencing—generally, a sentence within the statutory maximum will not disturbed on appeal. *State v. Kaiser,* 526 N.W.2d 722 (S.D.1995). Furthermore, consecutive sentences for two separate acts of statutory rape have been held to be constitutionally permissible. *State v. Phipps,* 318 N.W.2d 128, 132 (S.D.1982).

[¶ 11.] Sentencing decisions are perhaps the most difficult responsibility for trial judges, encompassing circumstances both obvious and elusive. It is not for us to engage in appellate resentencing, or to "micromanage the administration of criminal justice" in South Dakota, even when individual trial judges impose widely different punishments for the same offense. *See State v. DePiano,* 187 Ariz. 27, 926 P.2d 494, 498 (1996) *cert. denied* —— U.S. ——, 117 S.Ct. 782, 136 L.Ed.2d 726 (1997). One of the reasons why Congress enacted sentencing guidelines for federal courts was to reduce the disparity between what different judges consider appropriate punishment. That was a legislative decision. South Dakota has no pervasive sentencing guidelines; any sentence within the minimum and maximum limits set by the Legislature will ordinarily be left undisturbed. In many instances, this allows a judge a range of options to tailor a punishment to fit the crime and criminal.

[¶ 12.] Yet, if the words "Equal Justice Under Law" call for more than just a lofty inscription, then our vigilance ought to be aroused when extremely divergent sentences are imposed for the same offense. Gross disparity in punishment erodes public confidence in our institutions of justice. *See People v. Coles,* 417 Mich. 523, 339 N.W.2d 440 (1983).[3] Of course, equal treatment in sentencing does not mean senseless uniformity, but when a sentence is so out of proportion to the offense and so different from what others received for the same conduct, then

---

**2.** Appellate counsel was not defendant's attorney in circuit court.

**3.** We recognize that a sentence may also be excessively lenient, but neither the Legislature nor our federal and state constitutions authorize us to review and overturn such decisions. *But see* Nagel, Forward, structuring sentencing discre-

tion: The new federal sentencing guidelines, 80 J.Crim.L. & Criminology 883–884 (1990)("The purpose of the [federal Sentencing Reform Act] was to attack the tripartite problems of disparity, dishonesty, and for some offenses, excessive leniency, all seemingly made worse by a system of near unfettered judicial discretion.")

decency and conscience urge us to examine it more closely.

[¶ 13.] On many occasions, our Court has partly employed a "shock the conscience" query to determine if a sentence violates the Eighth Amendment prohibition against cruel and unusual punishment. The test was originally adopted for application only with our own state constitution, not the Eighth Amendment. *State v. Becker*, 3 S.D. 29, 40, 51 N.W. 1018, 1022 (1892). However, we declared this test to be roughly consistent with the gross disproportionality analysis used by the United States Supreme Court. *State v. Gehrke*, 491 N.W.2d 421, 423 (S.D. 1992). *See also State v. Brown*, 121 Idaho 385, 825 P.2d 482, 491 (1992)(shock the conscience test "essentially equivalent" to "grossly disproportionate" test). Today, we declare this test inapplicable to the federal constitution.[4]

[¶ 14.] The Eighth Amendment reflects our nation's belief in the dignity of every human being and the view that legislative and judicial power to punish criminal conduct, though given high deference, is not absolute. *Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861, 2868, 53 L.Ed.2d 982 (1977)(plurality opinion); *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)(plurality opinion); *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958)(plurality opinion); *Weems v. United States*, 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed. 793 (1910). In *Solem v. Helm*, 463 U.S. 277, 290, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637, 649 (1983), the Supreme Court set forth a three-factor proportionality analysis under the Eighth Amendment. It also decided that outside of capital cases, "successful challenges to the proportionality of particular sentences [will be] exceedingly rare." *Id.* 463 U.S. at 289–90, 103 S.Ct. at 3009, 77 L.Ed.2d at 649 (reviewing courts should give substantial deference to legislatures in determining the types and limits of punishments for crimes and the discretion trial courts possess in sentencing).

[¶ 15.] In *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Supreme Court substantially modified *Solem's* Eighth Amendment three-factor proportionality analysis. Regrettably, the *Harmelin* Court issued multiple opinions, none of which were fully supported by a majority of the justices. Justice Kennedy, joined by Justices O'Connor and Souter, constricted *Solem's* application, but declined to overturn it. To Justice Kennedy, *Solem* was "best understood as holding that comparative analysis within and between jurisdictions is not always relevant to proportionality review." *Id.* 501 U.S. at 1004–1005, 111 S.Ct. at 2707, 115 L.Ed.2d at 871. The Eighth Amendment, according to Justice Kennedy, still "encompasses a narrow proportionality principle" even in noncapital cases. *Harmelin*, 501 U.S. at 997, 111 S.Ct. at 2702, 115 L.Ed.2d at 866. "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* 501 U.S. at 1001, 111 S.Ct. at 2705, 115 L.Ed.2d at 869, (Kennedy, J., concurring)(quoting, in part, *Solem*, 463 U.S. at 288, 303, 103 S.Ct. at 3008, 3016, 77 L.Ed.2d at 648, 657). Justice Kennedy stated what he believed to be "some common principles that give content to the uses and limits of proportionality review." *Id.* 501 U.S. at 998, 111 S.Ct. at 2703, 115 L.Ed.2d at 867. These principles are:

---

4. We have not had occasion in modern times to consider South Dakota's own constitutional prohibition set out in S.D. Const.Art. VI, § 23: "Excessive bail shall not be required, excessive fines imposed, nor cruel punishments inflicted." Nonetheless, we decline at this time to invoke South Dakota's Bill of Rights since the Eighth Amendment analysis under the United States Constitution, which we are bound to apply here, is confounding enough and we hardly wish to further burden sentencing law by adopting dual constitutional standards. Most importantly, because we find the sentence imposed here for burglary to be in violation of the Eighth Amendment, we need not examine the question under South Dakota's Constitution. To bring ourselves in line with modern sentencing jurisprudence we now isolate for future consideration under our state constitution the "shock the conscience" formulation and adhere to the most recent pronouncements of the United States Supreme Court applicable to the Eighth Amendment. See *People v. Milbourn*, 435 Mich. 630, 461 N.W.2d 1, 6 (1990)(abandoning the shock the conscience test under Michigan's constitution as overly subjective).

(1) reviewing courts must grant substantial deference to the legislature's broad authority to determine the types and limits of punishment; (2) the Eighth Amendment does not mandate adoption of any one penological theory; (3) marked divergences "are the inevitable, often beneficial result of the federal structure"; and (4) proportionality review by federal courts should be informed by objective factors. *Id.,* 501 U.S. at 998–99, 111 S.Ct. at 2703–04, 115 L.Ed.2d at 867–68.

*Gehrke,* 491 N.W.2d at 423 fn. 2. At the very least a restricted proportionality analysis under *Solem* survives because seven of the justices in *Harmelin* supported it to some degree. *See Bult v. Leapley,* 507 N.W.2d 325, 333 (S.D.1993)(Henderson, J. specially concurring).

[¶ 16.] Until the Supreme Court speaks with greater unanimity, we will follow these "common principles" to determine if Bonner's sentences were grossly disproportionate. Other courts have likewise followed the Kennedy analysis. *See, e.g., U.S. v. Johnson,* 944 F.2d 396, 407–09 (8thCir.1991), (cert. denied, 502 U.S. 1008, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991)); *U.S. v. Manuel,* 944 F.2d 414, 417 (8thCir.1991). We think it noteworthy that Justice Kennedy declined to debate the conflicting historical theories on what precisely constitutes "cruel and unusual punishment." After all, the Eighth Amendment embodies an "evolving" set of standards, denoting "the progress of a maturing society." *Trop,* 356 U.S. at 100–01, 78 S.Ct. at 597–98, 2 L.Ed.2d at 642 (1958)(footnote omitted). As Justice Henderson remarked in response to the *Harmelin* decision, "the day of approving a sentence—simply because it is within statutory limits—is gone—like sod huts on the prairie." *State v. Pack,* 516 N.W.2d 665, 672 (S.D.1994)(Henderson, dissenting).

[¶ 17.] In summary, to assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. If these circumstances fail to suggest gross dis-

proportionality, our review ends. If, on the other hand, the sentence appears grossly disproportionate, we may, in addition to examining the other *Solem* factors, conduct an intra- and inter-jurisdictional analysis to aid our comparison or remand to the circuit court to conduct such comparison before resentencing. We may also consider other relevant factors, such as the effect upon society of this type of offense. *See Harmelin,* 501 U.S. at 1000, 111 S.Ct. at 2704, 115 L.Ed.2d at 868.

Sentences Grossly Disproportionate to the Offense

[¶ 18.] A. Burglary Sentence. Bonner received a fifteen year sentence and his two codefendants received suspended sentences with probation. Rarely will disparity be so immediate, when accomplices sentenced for the same offense receive diametrically opposite punishments. At the sentencing hearing, the trial court was informed of Bonner's history, mental disability, and the circumstances surrounding the crime, by virtue of the presentence report, psychological and psychiatric reports, statements from the victims of the burglary (who thought the fullest penalty should be imposed for all defendants), and testimony from Bonner's clinical social worker regarding Bonner's mental disorders and prospects for rehabilitation.

[¶ 19.] An appropriate sentence requires that:

> the sentencing court should "acquire a thorough acquaintance with the character and history of the man before it." This study should examine a defendant's "general moral character, mentality, habits social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record."

*Chase in Winter,* 534 N.W.2d at 354–55 (quoting *Pack,* 516 N.W.2d at 667–68 (citations omitted)). The sentencing court should also consider rehabilitation prospects. *Bult II,* 507 N.W.2d at 328. *State v. Lemley,* 1996 SD 91 ¶ 12, 552 N.W.2d 409, 412. At sentencing, the trial court discussed Bonner's limited intellectual capacity, prior juvenile record which it viewed as "not good," the crimes which showed "little if any

respect for other people and other people's property," as well as prior unsuccessful attempts to address Bonner's problems. The court described him as an "absolute danger," and explained "at some point in time we have to decide what we are going to do with people who have a propensity to violate the law, whether they have a limited capacity to think or perform or not." The court then concluded, "he should be separated from society period."

[¶ 20.] In the absence of specific details to use for comparison, we ordinarily defer to the trial judge's broad discretion in determining the extent of punishment to be imposed within applicable statutory limits. *Clark v. State,* 294 N.W.2d 916 (S.D.1980).

> Appellant does not state, nor does the record indicate, that appellant and La-Croix's past records, demeanor, degree of criminal involvement, etc., are sufficiently similar as to cause the sentence disparity between them to be unjust. Absent any showing of such similarities, we must defer to the trial judge's discretion.

*Id.,* 294 N.W.2d at 921. The same is not true in this case. Although little information appears in the record about Bonner's codefendants besides their names and the sentences each received, the record does reveal each defendant's degree of involvement in the burglary, which was essentially the same. The only possible difference between these three must be their backgrounds and the fact that Bonner pled guilty to an additional felony. Bonner's entire past record consisted of minor juvenile infractions and three nonviolent misdemeanor convictions as an adult. Even if we assume the codefendants had clean records, will the difference in backgrounds even remotely justify the antipodal disparity here?

[¶ 21.] Bonner's attorney argues that the sentence is offensive because of his limited intellectual capacity and his need for rehabilitation. People with mental retardation can be held accountable and punished for criminal acts they commit. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)(death penalty). For such persons, as with all convicted criminals, "[i]ncapacitation and deterrence are valid goals of

sentencing." *See Gehrke,* 491 N.W.2d at 425 (citing *Harmelin,* 501 U.S. at 999, 111 S.Ct. at 2704, 115 L.Ed.2d at 868). On the other hand,

> It is clear that mental retardation has long been regarded as a factor that may diminish an individual's culpability for a criminal act. (citations omitted). In its most severe forms, mental retardation may result in complete exculpation from criminal responsibility.

*Lynaugh,* 492 U.S. at 337, 109 S.Ct. at 2956, 106 L.Ed.2d at 290. Bonner's counsel and a clinical social worker argued at sentencing that the penal system did not lend itself to Bonner's mental disability. They urged the court to give Bonner a suspended imposition of sentence and place him on probation for ten to fifteen years to give him a chance to enter the Black Hills Workshop (an institution serving the developmentally disabled) where, in five to ten years, he will "probably function fairly independently."

[¶ 22.] The Supreme Court, speaking through Justice Scalia who delivered the decision in *Harmelin* with respect to part V of the opinion, held that individualized sentencing—consideration of mitigating factors—is only required in capital cases. *Harmelin,* 501 U.S. at 995, 111 S.Ct. at 2702, 115 L.Ed.2d at 865. Accordingly, we measure proportionality not by examining mitigating and aggravating details, but by "objective factors to the maximum possible extent," comparing the sentence with the criminal acts defendant committed and the consequences of those acts upon the victims and society. *Harmelin,* 501 U.S. at 1000, 111 S.Ct. at 2704, 115 L.Ed.2d at 868 (quoting *Rummel v. Estelle,* 445 U.S. 263, 274–75, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980)).

[¶ 23.] We conclude the fifteen year consecutive sentence Bonner received for second degree burglary was grossly out of proportion to the severity of the crime. Aside from the fact that his two codefendants received sentences at the opposite end of the spectrum, the following aids our decision: Bonner had no record of prior felony convictions or

other serious offenses.[5] *See Harmelin,* 501 U.S. at 1002, 111 S.Ct. at 2705, 115 L.Ed.2d at 869 (considering felonies constituting defendant's recidivism in *Solem* ). His only similar convictions were for acts of delinquency amounting to petty theft and one petty theft as an adult. Obviously this record will not necessarily excuse or mitigate his sentence, but it certainly bears on the question of gross disproportionality.

[¶ 24.] The particular circumstances of the offense, especially the absence of violence and menace, also indicate that the sentence was grossly disproportionate. *Harmelin,* 501 U.S. at 1002–1003, 111 S.Ct. at 2705–06, 115 L.Ed.2d at 869–870 (Solem's nonviolent crime in contrast to pervasive violence associated with illicit drugs). Second degree burglary is labeled as a violent crime in South Dakota, but no facts suggest any individual violence in this case. SDCL 22–1–2(9). We cannot overlook the fact that this case constitutes a less menacing form of burglary. Bonner was a purported invitee to the home where he stole a few items of property. Along with his two accomplices he returned the next day to take more music CDs. That event gave rise to the second degree burglary conviction against each of the three perpetrators. The property Bonner took from the home also generated second degree petty theft charges, implying that the prosecutor believed the items were worth less than $100.

[¶ 25.] Obviously, the Legislature in establishing a punishment range of zero to fifteen years for second degree burglary, intended the more serious commissions of this crime to deserve sentences at the harsher end of the spectrum. "[I]t is a precept of justice that punishment for the crime should be graduated and proportioned to the offense." *Weems v. United States,* 217 U.S. at 367, 30 S.Ct. at 549, 54 L.Ed. at 798. Thus a trial court's sentence ought to be proportionate to the particulars of the offense and the offender. Imposing the maximum possible term where the circumstances of the crime only justify a sentence at a lower range violates legislative intent "to reserve the most severe sanctions for the most serious combinations of the offense and the background of the offender." *People v. Milbourn,* 435 Mich. 630, 461 N.W.2d 1, 17 (1990). Furthermore, it is noteworthy to mention, arguably more serious wrongdoing in South Dakota carries penalties equal to or less severe than what Bonner received for his misconduct related to the burglary. For example, grand theft, stealing property valued in excess of $500, has a maximum penalty of ten years. SDCL 22–30A–17. Second degree manslaughter likewise carries ten years. SDCL 22–16–20.

[¶ 26.] Since we have received no comparative information to conduct the within and without analysis, we remand to the circuit court so that information can be supplied and the sentencing judge can take it into account on resentencing. We counsel the circuit court that while the commission of multiple crimes will influence the sentencing decision, punishment for a separate offense should be imposed in the case involving that offense. Commission of other crimes reflecting a defendant's proclivities will affect the sentence in the case under consideration, but these circumstances cannot justify imposing a grossly disproportionate sentence for the crime for which the defendant is being sentenced. *See Thomas v. State,* 333 Md. 84, 634 A.2d 1, 9 (1993)("punishment for separate conduct should be imposed in the case involving that conduct" although other conduct may affect "the ultimate determination of what is a fair sentence for the case under consideration.")

[¶ 27.] **B. Third Degree Rape.** With respect to Bonner's statutory rape sentence we must first determine, as we did with the burglary sentence, whether this is "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Harmelin,* 501 U.S. at 1005, 111 S.Ct. at 2707, 115 L.Ed.2d at 871. Severity in itself is not equivalent to cruel and unusual. There may be legitimate and com-

---

**5.** Other burglary and petty theft charges were dropped as part of the plea bargain. All these charges related to the Brodkorb home, with the exception of a burglary and theft charge for stealing a "boombox" from someone's porch.

pelling reasons why our Legislature decided to allow sentences of up to fifteen years in prison for this offense and why a sentencing court might believe the maximum sentence appropriate. The fact that a fourteen-year-old gives "consent" to sexual intercourse is of no relevant consideration. The very premise underlying statutory rape is that children are incapable of "consenting" to voluntary sexual relations. Regardless of the perpetrator's mental capacity, or the underage victim's voluntary participation, the consequences for statutory rape can be enormous: Childhood pregnancies, abortions, venereal diseases, unwanted births, abuse and neglect, all flow from premature and irresponsible sex. Moreover, child victims of sex offenses often develop life long emotional problems.

[¶ 28.] Crimes against children, especially sex offenses, have increased nationwide by epidemic proportions. Recognizing its pernicious impact, our Legislature in recent years has revised the law prohibiting statutory rape to reflect its accelerating concern with protecting children. In 1980 the law was amended to increase the penalty from ten to fifteen years and in 1984 amended again to raise the age of consent from fifteen to sixteen. *See* SDCL 22–22–1(5), 1980 S.L. ch. 175; 1984 S.L. ch. 167. The trial court reviewed this case in light of the required sentencing factors, including rehabilitation. *Lemley,* 1996 SD 91 at ¶ 12, 552 N.W.2d at 412. In addition, Bonner was able to avoid trial for alleged sex offenses with other children. The record fails to reveal the nature of those offenses, but we conclude his attorney knew of them and took them into consideration when entering the plea agreement. *See State v. Ferguson,* 519 N.W.2d 50 (1994); *State v. Chase in Winter,* 534 N.W.2d 350 (S.D.1995). Although the fifteen year sentence for third degree rape was severe it was not grossly disproportionate to the offense. Therefore, no further proportionality analysis is necessary.

[¶ 29.] The burglary case is reversed and remanded for resentencing. The sentence for statutory rape is affirmed.

[¶ 30.] MILLER, C.J., and SABERS, and AMUNDSON, JJ., concur.

* These cases were summarily affirmed by this

[¶ 31.] GILBERTSON, J., concurring specially.

GILBERTSON, Justice (concurring specially).

[¶ 32.] I fully join in the opinion of the Court. I write specially only to emphasize that in the past our overturning of a criminal sentence on the basis of cruel and unusual punishment has been "exceedingly rare" and under the standard adopted today it will continue to be "exceedingly rare." *Solem v. Helm,* 463 U.S. 277, 289–90, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637, 649 (1983).

[¶ 33.] This Court is routinely petitioned for relief from those serving 18 months for multiple no account checks or two years for burglary. These types of sentences never have been cruel and unusual and, under today's opinion, have no more basis for relief than in the past. *State v. Sharp,* 577 N.W.2d 333 (S.D. 1998); *State v. Pourier,* 575 N.W.2d 265 (S.D. 1997); *State v. Arguello,* 575 N.W.2d 265 (S.D. 1997); *State v. Sanchez,* 570 N.W.2d 42 (S.D.1997); *State v. McDonald,* 570 N.W.2d 43 (S.D.1997); *State v. Zoll,* 570 N.W.2d 246 (S.D.1997); *State v. Rosales,* 570 N.W.2d 246 (S.D.1997); *State v. Miles,* 570 N.W.2d 383 (S.D. 1997); *State v. Nelson,* 570 N.W.2d 383 (S.D. 1997); *State v. Whiteaker,* 557 N.W.2d 774 (S.D. 1996).* They are not " 'grossly disproportionate' to the crime" but are instead, highly appropriate. *See Harmelin v. Michigan,* 501 U.S. 957, 1001, 111 S.Ct. 2680, 2705, 115 L.Ed.2d 836, 869 (1991) (Kennedy, J., concurring) (quoting in part *Solem,* 463 U.S. at 303, 103 S.Ct. at 3016, 77 L.Ed.2d at 657).

Court when this issue was raised.