2005 SD 74

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Patrick Ryan McKINNEY, Defendant and Appellant.**

**No. 23314.**

Supreme Court of South Dakota.

Considered on Briefs April 25, 2005.

Decided June 15, 2005.

Lawrence E. Long, Attorney General, John M. Strohman, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Kelly Stricherz, Minnehaha County Public Defender's, Office, Sioux Falls, South Dakota, Attorneys for defendant and appellant.

PER CURIAM.

[¶ 1.] Patrick Ryan McKinney appeals his convictions and sentences for multiple counts of possession of child pornography in violation of SDCL 22–22–24.2(3). We affirm.

## FACTS

[¶ 2.] McKinney married Colleen O'Bleness in February 2002. She had two daughters from her prior marriage, K.H. and J.H. The couple had a computer in their bedroom and each of the girls had a computer in their rooms. The only computer with Internet access was the one in the bedroom McKinney shared with his wife. The family all had individual computer user names with individual passwords. Colleen knew McKinney's password until November 2002 when McKinney changed his password. Earlier that month, Colleen had discovered adult pornography on the computer. She questioned McKinney concerning the pornography, but he denied any knowledge of the material.

[¶ 3.] In January 2003 Colleen became concerned about McKinney's behavior. He did not contribute financially to the marriage and she thought he may be spending money over the Internet. She contacted a person with computer experience to run special software on the computer located in their bedroom. The program revealed more than 3,000 images. When opening one of the images, a picture of a "young girl, naked, leaned back in a chair with her legs spread open" was discovered. The computer technician left due to the highly offensive nature of the image. Colleen sorted through more of the images and discovered twenty to thirty photos which she believed were child pornography. These included photographs of young girls exposing themselves and also adult men engaged in sexual activity with children. She notified law enforcement and removed the computer from the home.

[¶ 4.] McKinney's wife also had law enforcement inform him that he was not welcome in the family home. During this encounter, McKinney was told the computer had "stuff" which concerned his wife. He responded by referencing "pedophiliac" and "children on the video screen." He also admitted to using KAZAA, a peer-to-peer file transferring website.

[¶ 5.] Law enforcement examined the hard drive of the computer in question and discovered child pornography in the recycle bin. These images were found under McKinney's user name "Ryan1" and all were time stamped during periods when McKinney was not at work. These images were all obtained from KAZAA.

[¶ 6.] McKinney was indicted for twenty counts of possession of child pornography in violation of SDCL 22–22–24.2. These twenty counts all related to short films that were found on the hard drive. Those files included the following titles:

▶ Child lover little collection video 0002.mpg

▶ Asian kid gets raped.mpg

▶ r@ygold 10 yo littlered.mpg

▶ r@gold 7 y old kiddy porn.mpg

▶ pedo-Japanese 10 yo boy and 11 yo girl.mpg

▶ R@ygold Style—TVGO13 (12) yrs girls really gets fucked.mpg

▸ Preteens—6yo FUCK(incomplete).avi

▸ 9yo fingered and blow—96 sec-ns.mpg

▸ KSX Vicky XXXXX—A Little Pre-Teen Trying To Put a Monster cock in Her.mpg.

The State's computer investigator testified that the specific name of each of these files would have to be "clicked" by the user for the file to be downloaded from KAZAA. Additionally, although these items had been deleted and were recovered in the computer's recycle bin, they were accessible by commercially available software. The investigator also testified that no "Trojan horse" or other virus was found on the computer that would have unknowingly downloaded these items.

[¶ 7.] A description of the heinous nature of the acts depicted in these video files is beyond our vocabulary. The videos depict rape, ejaculation, felatio and other sex acts performed on twenty separate male and female victims ranging in age from infants to adolescents. Also appalling was the subject of the testimony of McKinney's nine-year-old stepdaughter J.H. She testified at trial that while on the Internet visiting Disney sites, McKinney asked to show her something. McKinney placed her on his lap and showed her a video of a man and a little girl and "the man was licking the girl's privates." She further testified McKinney told her not to discuss this with anyone.

[¶ 8.] McKinney denied any knowledge of the images of child pornography on his computer. A jury convicted McKinney on all twenty counts. The trial court sentenced McKinney to five year prison terms for each conviction. The trial court further ordered that the sentences be served consecutively, a total of one hundred years. He appeals.

## ANALYSIS

### ISSUE ONE

[¶ 9.] **Whether there was sufficient evidence to support the convictions.**

[¶ 10.] SDCL 22–22–24.2(3) provides that "[a] person is guilty of possessing, manufacturing, or distributing child pornography if the person ... [k]nowingly possesses, distributes, or otherwise disseminates any visual depiction of a minor engaging in a prohibited sexual act, or in the simulation of such an act." SDCL 22–22–24.2(3). McKinney concedes that images of child pornography were found on this computer. However, he argues that other family members (his wife and two minor stepdaughters) also had access to the computer. He also asserts there was no evidence that he intentionally downloaded these images or knew their content. Instead, he points to the fact that these images had been deleted from the computer and were recovered in its recycle bin. He further maintains that the short time frames between the download of these files and their subsequent deletion indicated a lack of knowledge of their unsavory contents by the computer user. McKinney argues these facts do not support "knowing possession" of child pornography to sustain a conviction under SDCL 22–22–24.2.

[¶ 11.] "In determining the sufficiency of evidence on appeal, the test is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. In making this determination, this [C]ourt must accept the most favorable inferences that can be drawn therefrom in support of the verdict." *State v. Schmiedt*, 525 N.W.2d 253, 254–55 (S.D.1994). Furthermore, "[i]n determining the sufficiency of the evidence, this Court will not 'resolve conflicts in the evi-

dence, pass on the credibility of witnesses, or weigh the evidence.' No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt." *State v. Knecht,* 1997 SD 53, ¶ 22, 563 N.W.2d 413, 421. (internal citations omitted).

[¶ 12.] The facts presented to the jury established that McKinney had access to this computer and it was located in his bedroom. McKinney conceded images of child pornography were found on the computer. Additionally, the jury was presented with evidence that all of the images were related to McKinney's user name; the images were obtained from a file share network that McKinney admitted he used; none of the time stamps on the images occurred while McKinney was at work; his nine-year-old stepdaughter indicated McKinney showed her an image of child pornography; no Trojan horse or other virus was found on the computer that would unknowingly download such images; file names for these images indicated pornographic images of children and, upon learning that his wife had discovered "stuff" on the computer, McKinney referred to "pedophiliac" and "children on the video screen." This evidence, and the reasonable inferences drawn therefrom, was sufficient to sustain a reasonable theory of guilt.

[¶ 13.] Furthermore, there is no amount of time these images must be in a defendant's possession before a conviction can be upheld. As recognized in *State v. Martin,* 2003 SD 153, ¶ 40, 674 N.W.2d 291, 303, "[e]ven had [defendant] downloaded all the image files in a very short period of time ... he made a new decision to obtain each one. Every time he downloaded a new file, he recommitted himself to additional criminal conduct." Although these items were ultimately retrieved from the recycle bin of this computer, the testimony established they were downloaded from KAZAA, a file share network that McKinney admitted using. Therefore, even if these files had not been possessed for a lengthy period of time, the possession was sufficient to sustain a conviction. *See U.S. v. Tucker,* 305 F.3d 1193, 1204 (10th Cir.2002)(upholding conviction for possession of child pornography when defendant knowingly and deliberately deleted the images after each computer session); *U.S. v. Upham,* 168 F.3d 532, 537 (1st Cir.1999) ("the recaptured images were perfectly competent evidence of crimes committed before their deletion" *i.e.* the knowing possession of child pornography).

[¶ 14.] The jury was presented with sufficient evidence to sustain the twenty convictions for possession of child pornography.

ISSUE TWO

[¶ 15.] **Whether the trial court's sentence was an abuse of discretion.**

[¶ 16.] The trial court sentenced McKinney to five years imprisonment for each conviction. Because the sentences were to be served consecutively, he effectively received a one hundred year sentence. McKinney contends the trial court abused its discretion in imposing this sentence because it considered approximately one hundred and fifty uncharged images of child pornography, because it did not thoroughly acquaint itself with McKinney or his prospects for rehabilitation, and because it took into account the youthfulness of the victims when rendering sentence.

*A. Uncharged Conduct*

[¶ 17.] In pronouncing sentence, the trial court indicated,

[T]he Court can consider uncharged conduct and even conduct on which a per-

son has been acquitted when it comes down to sentencing. In this case, I am not only dealing with these twenty charges, I'm dealing with other 150 charges—possible charges that were never brought.

In regard to the consideration of uncharged conduct, this Court has stated that

Trial courts enjoy wide latitude in determining the applicable sentence for a defendant. *State v. Milk*, 2000 SD 28, ¶ 10, 607 N.W.2d 14, 17 (citation omitted). In order to determine the appropriate sentence, the 'sentencing court should' acquire a thorough acquaintance with the character and history of the man before it. *Id.* ¶ 16 (quoting *State v. Hinger*, 1999 SD 91, ¶ 21, 600 N.W.2d 542, 548 (citation omitted)). Therefore, we have held that sentencing courts may consider an extremely broad range of evidence in order to familiarize itself with a particular defendant. *State v. Arabie*, 2003 SD 57, ¶ 21, 663 N.W.2d 250, 257. *This consideration may include "inquiry into uncharged conduct or even conduct that was acquitted.'"* *Id.* (citing *US v. Schaefer*, 291 F.3d 932, 944 (7thCir.2002)).

*State v. McCrary*, 2004 SD 18, ¶ 8, 676 N.W.2d 116, 120 (emphasis added).

[¶ 18.] Therefore, the trial court correctly observed that it could consider uncharged conduct in imposing its sentence. A review of the authority relied upon in *McCrary* and *Arabie* indicates that to consider such conduct at sentencing, the State must prove the conduct by a preponderance of the evidence. *U.S. v. Schaefer*, 291 F.3d 932, 944 (7th Cir.2002) (citing *United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997)). Moreover, a defendant must have the opportunity to contest the uncharged conduct. *See McCrary*, 2004 SD 18, ¶ 30, 676 N.W.2d at 125. In this case, McKinney did not object to the uncharged conduct or otherwise seek to contest its consideration by the sentencing court. Therefore, this uncharged conduct was a proper consideration in formulating a sentence.

### B. Knowledge of the Defendant/Rehabilitation Prospects

[¶ 19.] McKinney also maintains that the trial court abused its discretion in not thoroughly acquainting itself with him or his prospects for rehabilitation. The range of evidence that may be considered at sentencing is broad.

In determining the type and extent of punishment to be imposed, the sentencing judge may exercise wide discretion with respect to the type of information used as well as its source. He should have full access to the fullest information possible concerning the defendant's life and characteristics. Information which should be available to the court includes general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record. It is obvious from these and other decisions that the sentencing judge is vested with the authority and burdened with the responsibility to inquire into the various aspects of each defendant's case before sentence is pronounced.

*State v. Arabie*, 2003 SD 57, ¶ 21, 663 N.W.2d 250, 257.

[¶ 20.] Here, the trial judge specifically indicated he had reviewed the file and his notes in preparing for the sentencing hearing. That file included a pre-sentence investigation report containing detailed information concerning McKinney's age, past criminal history, familial life, employment history, impact statements from his ex-wife and stepdaughter, and psychologi-

cal evaluations. This information also included prospects concerning McKinney's likelihood to re-offend and his "tendency to deny problems and his lack of insight into his own behavior." This clearly included information regarding McKinney's prospects for rehabilitation. *See State v. McKinney*, 2005 SD 73, ¶ 15, 699 N.W.2d 471.

[¶ 21.] Furthermore, McKinney consistently refused to accept responsibility for his crimes, including during the presentence investigation, during his psychological evaluations and when addressing the trial court during sentencing. That is significant because, as we noted in another case:

> [A]fter exercising the right to trial, a defendant's continued refusal to take accountability may be considered as a sign of lack of remorse. *State of Wisconsin v. Fuerst*, 181 Wis.2d 903, 915, 512 N.W.2d 243, 247 (1994). "Repentance has a role in penology. But the premise of our criminal jurisprudence has always been that the time for repentance comes after trial." *Scott v. United States*, 419 F.2d 264, 270 (D.C.Cir.1969). A sentencing court may consider a defendant's denial as part of its decision whether the defendant can be successfully rehabilitated. Rehabilitation must begin with an offender's acknowledgment of personal fault.

*State v. Clegg*, 2001 SD 128, ¶ 6, 635 N.W.2d 578, 580.

[¶ 22.] Thus, the record does reflect that the trial court considered the prospects of rehabilitation along with the gravity of the offense; its effect on the victims; McKinney's background and the interest of the public in deterring these types of offenses. Given this record, which includes the detailed sex offender evaluations, we believe that the trial court thoroughly acquainted itself with McKinney and his prospects for rehabilitation.

### C. Youthfulness of the Victims

[¶ 23.] McKinney finally maintains that the trial court erred in considering the youthfulness of these victims when rendering sentence. The trial court indicated:

> I am going to consider in the sentence this morning the nature of the images, the fact that we have youthful victims in this case—and maybe aren't even kids in this country, but [that] doesn't really make any difference, Mr. McKinney. You victimize a child in a foreign country, it's just as bad as if you victimized them somewhere in the city and it's just no distinction.

> * * *

> This is the type of conduct, Mr. McKinney, that really has to be stopped. It has to be stomped out, I guess, to use a phrase and people should understand that the possession of this type of material is not protected.

[¶ 24.] The trial court did not abuse its discretion in considering the nature of this crime, which involved young and vulnerable victims being sexually abused. It is a precept of justice that the trial court must be able to consider the nature of a defendant's crime when formulating an appropriate sentence within the statutory range. *See State v. Herrmann*, 2004 SD 53, ¶ 28, 679 N.W.2d 503, 511(holding trial court did not abuse its discretion in sentencing after considering the particularly heinous nature of the crimes at issue). This record reflects a reasoned, careful and informed review of the defendant and his crime, and the trial court did not abuse its discretion in imposing sentence.

ISSUE THREE

**[¶ 25.] Whether McKinney's sentence was grossly disproportionate to the crimes committed.**

[¶ 26.] "This Court gives great deference to sentencing decisions made by trial courts." *Milk*, 2000 SD 28, ¶ 10, 607 N.W.2d at 17 (citations omitted). "Initially, we review the sentencing court's decision under the abuse of discretion standard." *Herrmann*, 2004 SD 53, ¶ 26, 679 N.W.2d at 511. We held in Issue Two that the trial court did not abuse its discretion in rendering sentence. However, for assertions of constitutional error the standard "of review under both our federal and state constitutions is the gross disproportionality test." *State v. Pugh*, 2002 SD 16, ¶ 19, 640 N.W.2d 79, 85. Our gross disproportionality review is well-established:

> [T]o assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. If these circumstances fail to suggest gross disproportionality, our review ends. If, on the other hand, the sentence appears grossly disproportionate, we may, in addition to examining the other *Solem* factors, conduct an intra, and interjurisdictional analysis to aid our comparison or remand to the circuit court to conduct such comparison before resentencing. We may also consider other relevant factors, such as the effect upon society of this type of offense.

*State v. Bonner*, 1998 SD 30, ¶ 17, 577 N.W.2d 575, 580 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1000, 111 S.Ct. 2680, 2704, 115 L.Ed.2d 836, 868 (1991)). "Given our level of deference to the Legislature and sentencing court, we rarely overturn sentences within the statutory maximum."

*Herrmann*, 2004 SD 53, ¶ 26, 679 N.W.2d at 511.

[¶ 27.] This Court has previously held that each act of downloading an image of child pornography is a separate offense. *Martin*, 2003 SD 153, ¶ 42, 674 N.W.2d at 303. That is because the legislative rationale of protecting the children exploited during the production process "extends to each child in each picture." *Id.* We also note that the maximum sentence on each count of possession of child pornography was recently increased by the legislature in 2002 to ten years imprisonment. SDCL 22–22–24.2. Prior to that legislative change, the maximum sentence was two years imprisonment. SDCL 22–22–23.1. Obviously, this statutory change reflects an increased concern against the manufacture, distribution and possession of child pornography.

[¶ 28.] Although acknowledging that his sentence was within, and in fact well below that statutory maximum, McKinney nevertheless maintains that his sentence was unconstitutional. He argues this sentence was grossly disproportionate to his crimes because of his lack of a criminal record. This contention is barely worth mention in light of his virtually simultaneous convictions for rape, sexual contact with a minor and sexual exploitation of a minor. *See State v. McKinney*, 2005 SD 73, 699 N.W.2d 471. Moreover, those convictions involved the rape of his stepdaughter, a young girl that he intentionally exposed to this child pornography as his sexual deviance progressed from child pornography, to sexual exploitation, to sexual contact, and ultimately rape.

[¶ 29.] McKinney, however, maintains that this is not a serious case because he was not marketing the images. This assertion is clearly without merit. As the federal courts have recognized:

Unfortunately, the 'victimization' of the children involved does not end when the pornographer's camera is put away. The consumer, or end recipient, of pornographic materials may be considered to be causing the children depicted in those materials to suffer as a result of his actions in at least three ways.

*First*, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials. '[T]he materials produced are a permanent record of the children's participation and *the harm to the child is exacerbated by their circulation.*' *New York v. Ferber*, 458 U.S. 747, 759, 102 S.Ct. 3348, 3355, 73 L.Ed.2d 1113 (1982) (emphasis supplied); *see also* Child Pornography Prevention Act of 1996, PubL 104–208, 121, 110 Stat 3009–26, *reprinted in* 18 USC 2251 note at 611 (Supp II 1996) (hereinafter, 1996 Act) ('Congress finds that ... here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years....'); *Osborne v. Ohio*, 495 U.S. 103, 111, 110 S.Ct. 1691, 1697, 109 L.Ed.2d 98 (1990) ('The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come.'). The consumer who 'merely' or 'passively' receives or possesses child pornography directly contributes to this continuing victimization.

*Second*, the mere existence of child pornography represents an invasion of the privacy of the child depicted. Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent. *See Ferber*, 458 U.S. at 759 n. 10, 102 S.Ct. at 3356 n. 10 ("[D]istribution of the material violates 'the individual interest in avoiding disclosure of personal matters.'" (quoting *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977))); 1996 Act, 110 Stat at 3009–26 ('Congress finds that ... the creation or distribution of child pornography ... invades the child's privacy and reputational interests ...'). The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.

*Third*, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials. *See Osborne*, 495 U.S. at 109–12, 110 S.Ct. at 1696–97; *Ferber*, 458 U.S. at 756–60, 102 S.Ct. at 3355–56. As Congress put it in explicit factual findings:

[T]he existence of and traffic in child pornographic images ... inflames the desires of child molesters, pedophiles, and child pornographers, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials[.]

1996 Act, 121, 110 Stat at 3009–27. Plainly, Congress has described a chicken-and-egg scenario in which it would be impossible to determine whether child pornographers or consumers of child pornography were initially responsible for the creation of the child pornography industry. The underlying point, however, is that there is no sense in distinguishing, as [the defendant] has done, between the producers and the consum-

ers of child pornography. Neither could exist without the other. The consumers of child pornography therefore victimize the children depicted in child pornography by enabling and supporting the continued production of child pornography, which entails continuous direct abuse and victimization of child subjects.

*United States v. Norris,* 159 F.3d 926, 929–30 (5th Cir.1998).

[¶ 30.] In addition to the detrimental effects on the more than twenty children involved in this case, we also consider "the effect upon society of this type of offense." *Bonner,* 1998 SD 30, ¶ 17, 577 N.W.2d at 580. Thus, the trial court appropriately considered that McKinney's conduct victimized no less than twenty children and promoted a market for child pornography.[1] The trial court stated:

> I sat here during the period of time when the jury was observing the images as they were being broadcast on the screen, and I don't think I've ever seen 12 people on a jury, after it was done, be so numb that the emotions were just drained. They really couldn't see or take anymore and I don't think that's an unfair observation that I made of those 12 members of the jury-actually 13 at the time. Only 12 decided the case. There are victims in this case, Mr. McKinney. Every child on the screen was a victim and that's really what the tragedy of child pornography is all about is when somebody accepts this image and down loads it onto their computer— as what occurred in this case, you then give the makers a market.... If you don't down load the pornography on your computer at home, the market dries up, the kids aren't exploited and the situation then resolves itself, but

that's not what happens when you do what you did.

[¶ 31.] Based on the increased legislative concern for these offenses and the need to protect our children (two of the factors the trial court took into consideration), the penalty for possession of child pornography was significantly increased by eight years to a ten year maximum sentence. SDCL 22–22–24.2. This recent *increase* of eight years in the sentencing range is more than the entire sentence McKinney received for each conviction. McKinney will not be heard to complain when his sentence was not even as severe as the recent sentencing increase for each conviction.

[¶ 32.] Here, McKinney was not sentenced to one-hundred years for a felony. He was sentenced to five years for twenty separate felonies. Moreover, his conduct not only involved the possession of multiple images of child pornography depicting very young children, McKinney used this child pornography to further the sexual abuse of his stepdaughter. Considering that his sentence was within the midpoint of the sentencing range, the significant legislative increase in the range of punishment, and McKinney's failure to accept responsibility for his actions, this sentence does not suggest gross disproportionality.

[¶ 33.] Affirmed.

[¶ 34.] GILBERTSON, Chief Justice, SABERS, KONENKAMP, ZINTER and MEIERHENRY, Justices, participating.

---

1. While not conceding guilt, McKinney did acknowledge during his presentence investigation to being a member of pornographic websites including "Spanking Teen Jessica, Spanking Teen Brandi and Sex Key."