GILBERTSON, Chief Justice (on reassignment).
[¶ 1.] For the second time, Cameron Blair appeals his sentences for five counts of filming a minor in a prohibited sexual act as grossly disproportionate. We affirm.
FACTS AND PROCEDURE
[¶ 2.] Cameron Blair (Blair) shared custody of his daughter, who was fourteen years old at the time of the events leading up to Blair’s arrest, with his ex-wife. Blair had a long history of allowing his daughter to have her girlfriends spend the night at his home. At these slumber parties, the girls typically used Blair’s hot tub after which Blair would insist that the girls shower. Blair also required his daughter to shower several times a day while at his home.
[¶ 3.] On June 13, 2002, Blair’s daughter invited four girls to a sleepover at Blair’s home. At the time of the sleepover, the girls ranged in age from fourteen *57 to fifteen years old. The girls used the hot tub and were required by Blair to shower afterward. Ultimately, the girls became suspicious that Blair was videotaping them while they were in the bathroom.[1]
[¶ 4.] Sometime around midnight, Blair took two of the girls, who were fifteen at the time, down to the basement and engaged them in conversation. Blair told the girls that he was a therapist and offered advice and information about life and boys. He eventually shifted the topic to the subject of sex and masturbation. He attempted to get the girls to tell him how often and how they masturbated, and shared with them that he had masturbated that morning while watching a videotape of himself and a former spouse having sex. He also shared detailed stories about his past sexual experiences. Blair told the girls he liked women with big nipples, and then repeatedly asked them to show him their breasts. At some point in the conversation, Blair pulled his gym shorts flat against his body to reveal the outline of his penis and testicles, which he then pointed out and named for the “educational benefit” of the two girls. While he was explaining and pointing out his male anatomy, his penis extended beyond the hem of his shorts and was visible for a minute or more.[2] During the course of the evening, Blair also rubbed one of the girls on her upper thigh, explaining the “proper” way to excite a man. This “therapy session” lasted for several hours. Several times during the conversation, Blair’s daughter attempted to come downstairs to ask what the group was discussing. However, Blair repeatedly sent her back upstairs and directed her to stop interrupting his conversation.
[¶ 5.] Finally, at approximately 6 a.m. the “therapy session” ended when the two girls decided to feign sleep in order to end the conversation. Blair offered to tuck the two girls into bed. He sat down between the two girls on the bed and rubbed their heads “to help them fall asleep faster.” As Blair got up from the bed, he grabbed both girls’ buttocks over the covers and left the room. The girls then ran to the bathroom and locked themselves inside to change clothes. They left Blair’s home and returned to the home of one of the girls, where they reported the events to the girl’s mother. When Blair’s ex-wife learned what had occurred at the slumber party, she called the police and an investigation was initiated.
[¶ 6.] The investigation originally centered on Blair’s conduct on the night of the slumber party. However, a search warrant was issued after Blair’s daughter told police she had seen a videotape of a seven- or eight-year-old male foster child placed in Blair’s care, in which the child was filmed in the nude. The search of Blair’s home revealed a VHS format videotape containing fifty separate instances in which girls as young as age eleven were surreptitiously videotaped by Blair while in the bathroom. The police also discovered that a crack in the wall between the bathroom and the laundry room recently had been patched. The location of the crack was such that it provided visual access to the bathroom and was of sufficient size to permit videotaping.
*58 [¶ 7.] A Minnehaha County deputy state’s attorney showed Blair’s daughter and one of her friends still photographs made from the videotape as part of the investigation into Blair’s conduct. His daughter identified herself and four of her friends from the still photographs and from the appearance of the victims, clothing, hairstyles and voices captured on the videotape. She was also able to determine that the videotaping occurred at Blair’s current and former homes, and the approximate dates when the videotaped images were captured. The other girl also was able to identify herself, other friends, locations, and approximate dates from the still photographs. From these interviews, the deputy state’s attorney was able to determine that the girls in the videotape ranged in age from eleven to fourteen, and that over the course of eighteen months, Blair surreptitiously videotaped them.
[¶ 8.] The videotape seized by police contained over ninety-one minutes of images. The first few seconds are a recording of a small portion of a newscast. The tape then transitions to images shot by Blair. Of the ninety-one minutes of videotape shot by Blair, twenty-four minutes were shot while the camera was in a stationary location. Of those twenty-four minutes, eleven minutes are of Blair and an adult woman engaged in sexual activity. The other thirteen minutes are of the children showering, using the toilet, and performing other common everyday functions. However, the balance of the videotape is of an entirely different character.
[¶ 9.] Approximately sixty minutes of the videotape were shot by Blair while manipulating the camera in order to obtain specific footage, angles and content. As the circuit court noted, the content Blair was after included close-up and zoomed in shots of the breasts, nipples, pubic area, and genitalia of Blair’s daughter and four of her friends while they were engaging in common everyday functions in the bathroom. By zooming in, manipulating the camera angle around clothing and towels, and at times turning the camera upside down to shoot up between a girl’s legs, Blair sought to obtain as much footage as possible of these specific body parts of the five girls. The videotape also included footage of one of the young girls masturbating with a hairbrush.
[¶ 10.] In addition to the footage of the naked bodies of girls ranging in age from eleven to fourteen, a few images were of one or two adult women. There was also a clip of approximately fifty-five seconds in length in which a young pre-adolescent boy is shown naked as he exits the shower and towels off. The camera was manipulated by Blair and zoomed in on the young boy’s genitals.
[¶ 11.] Based on the images on the edited videotape, it is obvious that it does not play in the same order in which the images were shot. Rather, each of the fifty instances of videotaping were filmed at a different time across an eighteen month time frame and in two different locations. The footage was then edited and spliced together to produce the VHS videotape containing the ninety-one minutes of images.[3] Law enforcement was able to determine that the newer images were filmed in Blair’s present home through the crack in the wall, while older images were filmed *59 in his previous home through a grate between the bathroom and Blair’s bedroom.
[¶ 12.] The police also discovered a computer disk with two images of child pornography. One image was of two small girls approximately five to six years of age, in which one of the girls was touching the other in a sexual manner. The second image appeared to be of a five-year-old girl masturbating the erect penis of an adult male.[4]
[¶ 13.] Based on the images discovered on the videotape, Blair was charged with five counts of filming a minor in a prohibited sexual act in violation of SDCL 22-22-23. Prior to its repeal, SDCL 22-22-23 provided in relevant part:
Any person who causes or knowingly permits the photographing or filming of a minor under the age of sixteen years to engage in a prohibited sexual act or in the simulation of such act is guilty of a Class 4 felony. Any person who photographs or films a minor under the age of sixteen years engaging in a prohibited sexual act or in the simulation of such an act is guilty of a Class 4 felony.
The definition of a prohibited sexual act included “nudity if such sexual act is depicted for the purpose of sexual stimulation or gratification of any person who might view such depiction.” SDCL 22-22-22 (repealed by S.D. S.L. 2002, ch. 109, § 1). As a Class 4 felony, a conviction under SDCL 22-22-23 was punishable by up to ten years in the state penitentiary. SDCL 22-6-1.
[¶ 14.] A separate criminal file was opened for the child pornography images. Blair was then charged with one count of possession of child pornography in violation of SDCL 22-22-23.1.[5] Blair pleaded not guilty to all the charges in circuit court. He later changed his plea to guilty to the five charges of filming a minor in a prohibited sexual act and one count of possession of child pornography. In exchange, charges for the other forty-five images of a minor photographed in a prohibited sexual act and one image of child pornography were not brought.
[¶ 15.] At a sentencing hearing conducted on December 4, 2002, one of the victims attempted to testify but was unable to do so due to emotion. Instead, her mother read her statement into the record. The mother of another one of the victims also read her daughter’s statement into the record. In addition, Blair’s daughter and first ex-wife sent letters to the judge but asked that they not be read in open court due to the extensive amount of publicity the case had received in the local media. The circuit court also considered a pre-sentence investigation report conducted by a court services officer, treatment notes and a sexual offender evaluation conducted by Sister Mary Carole Curran, Ph. D., and letters of support from Blair’s family.
*60 [¶ 16.] The circuit court imposed the maximum ten-year sentence on each of the five counts of filming a minor in a prohibited sexual act to be served consecutively, for a total of fifty years in the penitentiary. No jail time was imposed for the possession of child pornography charge, but Blair was required to register as a sex offender under the conditions of the plea agreement. Blair appealed the sentence to this Court, arguing the sentence was grossly disproportionate. We affirmed the circuit court’s sentence for the child pornography count, but reversed and remanded Blair’s original sentence of ten years for each of the five counts of filming a minor in a prohibited sexual act. We specifically ordered the circuit court to examine Blair’s rehabilitation prospects, and then resen-tence Blair taking into account the factors set forth in State v. Hinger, 1999 SD 91, 600 N.W.2d 542, and State v. Bonner, 1998 SD 30, 577 N.W.2d 575. However, at that point in time, the appellate record lacked a copy of the videotape, the pre-sentence investigation report, police reports and Curran’s treatment notes and sex offender evaluation.
[¶ 17.] As ordered by this Court, the circuit court engaged in a disproportionality analysis using the Hinger/Bonner factors. The circuit court found that Blair’s conduct, criminal background, and lack of remorse supported his original sentences, and that the sentences were not grossly disproportionate. Despite its finding that the sentences were not grossly disproportionate, the circuit court, for the sake of judicial economy, conducted an intra-juris-dictional review of similar offenses based on the evidence introduced by defense counsel. A second sentencing hearing was then scheduled. Defense counsel produced certified copies of a proportionality report compiled by the Unified Judicial System listing all convictions for violations of SDCL 22-22-23. Defense counsel submitted a brief arguing Blair’s sentence was disproportionate to his crime when compared to ten other individuals convicted of the same or similar crimes. The State did not submit a brief.
[¶ 18.] The circuit court analyzed all ten cases provided by defense counsel in its written opinion. The circuit court found that only the case of State v. Spack was similar to the facts of Blair’s case, but also acknowledged that the cases had major differences.[6] The circuit court also reviewed Blair’s level of remorse, comparing it to that of the defendant in State v. Stahl, 2000 SD 154, 619 N.W.2d 870.[7]
*61 [¶ 19.] At Blair’s resentencing, the circuit court again imposed ten years in the penitentiary on each of the five convictions to be served consecutively, for a total of fifty years. However, the circuit court suspended two years on each conviction with conditions, resulting in a sentence of forty years. Blair raises one issue on appeal: Whether Blair’s forty-year sentence is grossly disproportionate to his crimes and therefore constitutes cruel and unusual punishment.
STANDARD OF REVIEW
[¶ 20.] Generally, a sentence within the statutory maximum is reviewed by this Court under the abuse of discretion standard. State v. McKinney, 2005 SD 73, ¶ 10, 699 N.W.2d 471, 476 (McKinney I) (citing State v. Goodroad, 1997 SD 46, ¶ 40, 563 N.W.2d 126, 135 (citing State v. Anderson, 1996 SD 46, ¶ 30, 546 N.W.2d 395, 402)). ‘We give ‘great deference to sentencing decisions made by trial courts.’ ” State v. Garber, 2004 SD 2, ¶ 13, 674 N.W.2d 320, 323 (quoting State v. Milk, 2000 SD 28, ¶ 10, 607 N.W.2d 14, 17 (citing State v. Gehrke, 491 N.W.2d 421, 422 (S.D.1992))). “Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence[.]” Id. (quoting Milk, 2000 SD 28, ¶ 10, 607 N.W.2d at 17 (quoting Gehrke, 491 N.W.2d at 423)). Thus, this Court will rarely overturn a sentence within the statutory maximum on appeal. State v. Herrmann, 2004 SD 53, ¶ 26, 679 N.W.2d 503, 511 (citing Garber, 2004 SD 2, 28, 674 N.W.2d at 327).
[¶ 21.] However, when a defendant challenges a sentence on Eighth Amendment grounds, our review is conducted using the standards set out in State v. Bonner, 1998 SD 30, 577 N.W.2d 575. State v. Piper, 2006 SD 1, ¶ 72, 709 N.W.2d 783, 810-11. We employ the following well-established principles when reviewing the proportionality of a given sentence:
To assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. If these circumstances fail to suggest gross dispro-portionality, our review ends.
Id. ¶ 72 (quoting Bonner, 1998 SD 30, ¶ 17, 577 N.W.2d at 580 (citing Harmelin v. Michigan, 501 U.S. 957, 1000, 111 S.Ct. 2680, 2704, 115 L.Ed.2d 836 (1991))). We also compare “the sentence with the criminal acts defendant committed and the consequences of those acts upon the victims and society.” Bonner, 1998 SD 30, ¶ 22, 577 N.W.2d at 581 (citing Harmelin, 501 U.S. at 1000, 111 S.Ct. at 2704, 115 L.Ed.2d 836 (quoting Rummel v. Estelle, 445 U.S. 263, 274-75, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980))). Only when the sentence appears grossly disproportionate will this Court conduct an intra and inter-jurisdictional analysis. Bonner, 1998 SD 30, ¶ 17, 577 N.W.2d at 580.
[¶ 22.] On review, we also must adhere to the well-settled principle that this Court does not “resolve conflicts in evidence, pass on credibility of the evidence, or weigh the evidence^]” Piper, *62 2006 SD 1, ¶ 84, 709 N.W.2d at 815 (citing State v. Romero, 269 N.W.2d 791 (S.D.1978)). Not having had the benefit of witnesses appearing before us, we must defer to the circuit court’s assessment on the credibility of witnesses. Id. (citing State v. Burtzlaff, 493 N.W.2d 1, 4-5 (S.D.1992)).
ANALYSIS AND DECISION
[¶ 23.] The United States Supreme Court has recognized the unique and compelling interest the state has in “safeguarding the physical and psychological well-being of a minor.” Osborne v. Ohio, 495 U.S. 103, 109, 110 S.Ct. 1691, 1696, 109 L.Ed.2d 98 (1990) (quoting New York v. Ferber, 458 U.S. 747, 756-758, 102 S.Ct. 3348, 3354-3355, 73 L.Ed.2d 1113 (1982)). That Court has also recognized that virtually all states and the Federal government have passed legislation prohibiting the production of child pornography. Ferber, 458 U.S. at 758, 102 S.Ct. at 3355, 73 L.Ed.2d 1113. This is because “the use of children as subjects of pornographic materials is harmful to the physiological, emotional and mental health of the child.” Id.
[¶ 24.] This Court has previously noted in Bonner, “[c]rimes against children, especially sex offenses, have increased nationwide by epidemic proportions.”[8] 1998 SD 30, ¶ 28, 577 N.W.2d at 583. Because our state laws are clear that no child should ever be used for sexual gratification,[9] our Legislature sought to impose a significant penalty upon those who use children in the production of child pornography, or who distribute or possess child pornography. State v. McKinney, 2005 SD 74, ¶ 27, 699 N.W.2d 460, 468 (McKinney II). As part of the statutory scheme designed to protect children from those who seek to manufacture or produce child pornography, the Legislature codified the photographing or filming of child in a prohibited sexual act as a Class 4 felony.[10] *63 SDCL 22-22-23 (repealed by S.L. 2002, ch. 109 § 2). As such, up to a maximum of ten years imprisonment in the state penitentiary may be imposed for the conviction on one count, in addition to a fíne of ten thousand dollars per conviction. SDCL 22-6-1(7).
[¶ 25.] When the Legislature defined what constituted a prohibited sexual act under SDCL 22-22-22, it did not distinguish between or create degrees for the prohibited sexual acts. Instead, the statute provided:
Prohibited sexual act, as used in §§ 22-22-23, 22-22-23.1, and 22-22-24 means, sexual intercourse, anal intercourse, masturbation, bestiality, sadism, masochism, fellatio, cunnilingus, or incest and any other sexual activity including nudity if such sexual activity is depicted for the purpose of sexual stimulation or gratification of any person who might view such depiction. Encouraging, aiding, abetting, or enticing any person to commit any such prohibited sexual act as provided in this section is a prohibited sexual act.
SDCL 22-22-22 (repealed by S.L. 2002, ch. 109 § 1). The Legislature understood that a circuit court would have the discretion to impose a sentence within the zero to ten year range without regard to which of the prohibited sexual acts was depicted in a particular film or photograph upon which a conviction under SDCL 22-22-23 was based. That is because the code provision did not distinguish between the different types of sexual activity, or define depictions of some activities as more egregious than the depiction of other prohibited sexual acts.
[¶ 26.] However, it is well settled that sentencing discretion must be exercised with the understanding that “the Legislature in establishing a punishment range of zero to [ten] years for [photographing a child in a prohibited sexual act,] intended the more serious commissions of this crime to deserve sentences at the harsher end of the spectrum.” Bonner, 1998 SD 30, ¶ 25, 577 N.W.2d at 582. Courts must “reserve the most severe sanctions for the most serious combinations of the offense and the background of the offender.” Id. (quoting People v. Milbourn, 435 Mich. 630, 461 N.W.2d 1, 17 (1990)).
[¶ 27.] We have previously stated that in order to impose a sentence that is proportionate to the particulars of the offense and the offender, the circuit court must “acquire a thorough acquaintance with the character and history of the [person] before it.” Bonner, 1998 SD 30, ¶ 19, 577 N.W.2d at 580 (quoting State v. Chase in Winter, 534 N.W.2d 350, 354-55 (S.D.1995)). The Hinger/Bonner factors are the appropriate factors for the circuit court to consider when determining sentencing, which include the defendant’s “general moral character, mentality, habits, sociál environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.” Id. (quoting Chase in Winter, 534 N.W.2d at 354-55). In addition, the trial court considers the rehabilitation prospects of the particular defendant. Id. (quoting Bult v. Leapley, 507 N.W.2d 325, 328 (S.D.1993)). Finally, the impact of the crime on the victim or victims, including “evidence relating to personal eharacteris- *64 tics of the victim and the emotional impact of the crime ...also may be examined and considered by the trial court. State v. Rhines, 1996 SD 55, ¶ 130-134, 548 N.W.2d 415, 445-46 (quoting Payne v. Tennessee, 501 U.S. 808, 811, 111 S.Ct. 2597, 2601, 115 L.Ed.2d 720 (1991)). "When acquiring a thorough acquaintance of the man before it, the circuit court has wide discretion with respect to the type of information used as well as its source. McKinney II, 2005 SD 74, ¶ 17, 699 N.W.2d at 466 (quoting State v. Arabie, 2003 SD 57, ¶ 21, 663 N.W.2d 250, 257). “This consideration may include inquiry into ‘uncharged conduct[.]’ ” Id. (citing United States v. Schaefer, 291 F.3d 932, 944 (7th Cir.2002)).
[¶ 28.] Blair argues in his second appeal before this Court, that his reduced sentence of forty years on five counts of filming a minor in a prohibited sexual act is grossly disproportionate. He contends that a long penitentiary sentence was not appropriate or necessary given the facts of his case, and that the circuit court should have sentenced him at the lower end of the range. Blair offers as support for his contention the fact that he has no significant prior criminal history,[11] the sex offender evaluation rates him in the low to moderate range to re-offend, and that the court services officer’s pre-sentence investigation indicates Blair was remorseful. He also argues his prospects for rehabilitation were ignored by the circuit court. In addition, Blair argues his conduct was less severe in nature, and therefore deserving of punishment at the lower end of the range, because he did not direct the girls to engage in “intercourse, anal intercourse, bestiality, sadism, fellatio, etc.,” nor was there any sexual contact between Blair and the victims. Finally, Blair argues that the injury inflicted upon the young girls occurred as a result of the state’s attorney divulging the existence of the videotape and showing portions of it to the girls as part of his investigation, and that his lesser culpability in inflicting the injury should have been considered by the circuit court at sentencing.
[¶ 29.] It is clear from the record that Blair was not sentenced to forty years for filming a minor in a prohibited sexual act. Blair was sentenced to eight years on each of the five counts of photographing five different children in a prohibited sexual act, while no prison time was imposed for Blair’s sixth felony count of possession of child pornography. The five eight-year sentences were then imposed consecutively for a total of forty years.
[¶ 30.] On review this Court must first determine whether a ten-year sentence, with two years suspended, is grossly disproportionate for each of the five felonies. Then, we must determine whether the imposition of five consecutive sentences is grossly disproportionate given the particulars of the offense and the offender. As we noted in Hinger, 1999 SD 91, ¶ 20, 600 N.W.2d at 548, “[t]he question becomes whether this ‘most severe’ sanction was reserved for ‘the most serious combination of the offense and the background of the offender.’ ” In doing so, we decline Blair’s invitation to review the sentence under the premise that he was sentenced to forty years for filming a minor in a prohibited sexual act.
[¶ 31.] The circuit court is given authority to impose consecutive sentences under SDCL 22-6-6.1, which provides:
*65 If a defendant has been convicted of two or more offenses, regardless of when the offenses were committed or when the judgment or sentence was entered, the judgment or sentence may be that the imprisonment on any of the offenses or convictions may run concurrently or consecutively at the discretion of the court.
SDCL 22-6-6.1 authorizes the circuit court to impose consecutive sentences at its discretion. State v. Moran, 2003 SD 14, ¶ 57, 657 N.W.2d 319, 332. In doing so, it must consider, as it must in any sentencing procedure, the Hinger/Bonner factors. Supra ¶ 27.
[¶ 32.] We address each of the following factors separately on review: Blair’s previous criminal record, his inclination to re-offend, his level of remorse, his rehabilitation prospects, the danger he presents to the community, and the effects of the crime on the victims.

Previous Criminal Record

[¶ 33.] At the second sentencing hearing, the circuit court took into account all of the factors listed in Hinger/Bonner, noting that it considered Blair’s lack of a significant prior criminal record to be irrelevant under the circumstances of this case. Our case law makes it clear that the existence or absence of prior criminal offenses is one of many factors to be considered by the trial court when imposing a sentence. See Hinger, 1999 SD 91, ¶ 21, 600 N.W.2d at 548. However, it is within the circuit court’s sentencing discretion to determine how much weight to give any of the relevant sentencing factors, including a defendant’s prior criminal history. See Piper, 2006 SD 1, ¶ 84, 709 N.W.2d at 815 (holding on appeal this Court does not reweigh the evidence reviewed by the circuit court).
[¶ 34.] While the circuit court’s choice of language seems to indicate it did not consider the lack of significant prior criminal history when it imposed Blair’s sentence, a fair reading of the record indicates that the circuit court heavily discounted this factor in comparison to the other relevant factors it considered. The circuit court gave greater weight to other sentencing factors such as the number of charges that could have been filed against Blair, Blair’s lack of remorse and candor, the escalation of Blair’s conduct over the eighteen-month period in question, the age of the victims, and the effects of Blair’s crimes on the five young girls victimized by his acts.
[¶ 35.]In the instant ease, Blair could have been indicted and convicted of fifty or more violations of SDCL 22-22-23 based on the contents of the videotape, and two counts of possession of child pornography. Thus, he faced a potential of 500 or more years in prison if all charges had been brought and the maximum sentence imposed on each charge. However, under the terms of the plea bargain Blair pleaded guilty to only five counts of filming a minor in a prohibited act under SDCL 22-22-23 and one count of possession of child pornography. It was within the circuit court’s broad discretion to take note of these additional uncharged counts when determining an appropriate sentence. See McKinney II, 2005 SD 74, ¶ 18, 699 N.W.2d at 466.

Inclination to Re-offend

[¶ 36.] Blair argues that Curran’s sex offender evaluation and the court services officer’s pre-sentence investigation offer significant evidence that he was at low risk to re-offend, and therefore a lower sentence was required. The relevant factors Blair argues the circuit court failed to consider were the low to moderate score he received on the sex offender evaluation; and the court services officer’s assessment of Blair’s candor, his assessment that Blair’s crimes were on the lower end of the *66 scale for sex offenses, and his sentencing recommendation.
[¶ 37.] The psychological assessment conducted by Curran included two different instruments, the Minnesota Multi-Pha-sic Personality Inventory (MMPI-II)[12] and the Sexual Adjustment Inventory (SAI), which, according to her report, “is designed to identify sexually deviate and paraphiliac[13] behavior in people accused or convicted of sexual offense.”
[¶ 38.] Curran reported that when responding to questions on the MMPI-II, “Blair attempted to place himself in an overly positive light by minimizing faults and denying psychological problems.” Blair’s MMPI-II profile was, with appropriate correction, within the normal range. However, Curran’s report goes on to state that as a result of Blair’s minimization of faults and denial of psychological problems, the assessments “may be an underestimate of Mr. Blair’s psychological problems.”
[¶ 39.] Curran’s report also states that Blair was untruthful in his responses on the SAI. The directions to the assessment specifically state not to give false information as court records may be used for verification. Yet despite the warning in the instructions, Blair’s responses were anything but true. Blair reported zero arrests, yet his court records indicated four arrests. Similarly, Blair answered zero for the number of lifetime misdemeanor convictions, zero for the number of times on probation, zero for the number of times in jail, zero for the number of sex related arrests and zero for alcohol related arrests. However, Blair’s court records indicate each of these items should have been answered with a one.
[¶ 40.] Curran discussed these self-reported discrepancies in her report, and stated that “[t]here was insufficient time to rerun the data to determine the effect these inaccuracies might have had on the overall results. The results reported are those obtained assuming the data initially provided was truthful.” Curran further stated “[t]hese results imply that Mr. Blair is not a rapist and that he has a low probability for sexual assault.” Curran also stated that Blair scored in the medium risk range (forty to sixty-nine percentile) on the sexual adjustment scale, ranking in the fifty-sixth percentile. Curran indicated that “[s]ome caution and concern are evident regarding this person’s sexual adjustment responses.” Finally, Curran reported that Blair’s test results suggest that he is exhibiting psychological dysfunction of mild to moderate severity, but qualified this by noting that “it is impossible to know how much, if at all, his SAI scores would have been affected had the correct background information been provided.”
[¶ 41.] Blair has attempted to characterize the report as strong positive mitigating evidence, as it contains an expert opinion that he is a low risk on the sexual *67 assault scale, child molestation scale, and incest scale. While that may be true based on his responses as captured on the MMPI-II and SAI administered by Cur-ran, it is obvious that Blair was less than truthful on each of these diagnostic tools, a fact not lost on the circuit court.
[¶ 42.] Next, Blair argues that the circuit court did not consider the court services officer’s sentencing recommendation. He contends that the court services officer’s recommendation of “a considerable amount of time with most of it suspended and with some specific recommendations to the parole board upon release” is entitled to greater weight than it was given by the circuit court. Blair argues that the court services officer had substantial experience in dealing with and interviewing defendants, and had no reason to “sugar coat” his opinions and reports.
[¶ 43.] While the court services officer did recommend a more lenient sentence, his final recommendation included a concession that he could not “be sure [Blair’s sex crimes] would not have escalated into something more serious and perverted.... ” The veteran officer also noted that while Blair was very “open and talkative,” whether or not he was “truthful is very hard to say as ‘sex offenders’ are the biggest ‘cons’ and are usually very convincing.”
[¶ 44.] The circuit court is entitled to great discretion in weighing evidence. Based on the evidence before it, the circuit court found that Blair presented a greater risk to re-offend than either Curran or the court services officer concluded. Their conclusions were based on what the circuit court determined to be less than truthful responses from Blair given in an attempt to place himself, in an overly positive light.
[¶ 45.] In its analysis of Blair’s likelihood to re-offend, the circuit court heavily focused on the escalation of Blair’s conduct the night of his daughter’s sleepover. Blair attempted to get two of the girls to discuss masturbation with him, and to show him their breasts. Blair did so by engaging them in an all-night “therapy session” using skills developed as a youth advisor and counselor, and his position as an authority figure, as tools to manipulate these two fifteen-year-old girls under the guise of “educating” them for their own “benefit.” Compare State v. Mitchell, 491 N.W.2d 438, 439-440 (S.D.1992) (rejecting the defendant’s proffered justification for repeatedly raping his stepdaughter that he was preparing her for dating); Mitchell v. Class, 524 N.W.2d 860, 861 (S.D.1994) (affirming thirty-year sentence on six counts of rape, rejecting defendant’s, explanation that he was educating his stepdaughter on intercourse). Although no sexual contact occurred that evening, it was not for want of trying on Blair’s part as he repeatedly asked the two girls to show him their breasts, rubbed one of the girls’ on her upper thigh, grabbed both girls’ buttocks, and exposed his penis to them. The circuit court did not err when it gave greater weight to this evidence than the evidence generated from Blair’s less than truthful responses to Curran and the court services officer.

Remorse

[¶ 46.] Remorse is a factor appropriate for the circuit court to take into consideration when imposing a sentence. Stahl, 2000 SD 154, ¶ 7, 619 N.W.2d at 872 (citing Ganrude v. Weber, 2000 SD 96, ¶ 12, 614 N.W.2d 807, 810; Chase in Winter, 534 N.W.2d at 355). However, the circuit court is the final arbiter of the truthfulness of a witness. Piper, 2006 SD 1, ¶ 84, 709 N.W.2d at 815 (citing Burtzlaff, 493 N.W.2d at 4-5).
[¶ 47.] The circuit court relied heavily on what it perceived to be Blair’s lack of candor to the court, to Curran, and to the *68 court services officer when it evaluated Blair’s level of remorse. The circuit court noted Blair was less than truthful when he was assessed using the MMPI-II, and noted that his lack of candor was even more apparent on the SAI where Blair failed to self report his criminal history despite the warning that court records could be used to verify the truthfulness of his answers.
[¶ 48.] Blair argues in his brief that he did not understand that the suspended imposition of sentence for his prior DUI arrest and probation would be a part of his record since no judgment of record was entered. However, Blair entered zero for all questions concerning past criminal conduct, arrests for sex related crimes, convictions, probation and times in prison. All this despite the fact that Blair was incarcerated at the time he took the assessment, after having been arrested for a sex related crime.
[¶ 49.] The circuit court also gave great weight at the original sentencing hearing, and in its disproportionality analysis on remand, to the fact that Blair could offer no cogent explanation for his conduct or why he did not believe he would be discovered. The only explanation offered by Blair to Curran and the court services officer for his conduct was “curiosity.”
[¶ 50.] What possible curiosity value could such videotape footage have for a twice-married-and-divorced forty-two-year-old father, who claimed to not have dated lately and who had problems relating to adult women? The only possible “value” or “benefit” to Blair of the videotaped footage of his naked daughter and her friends at the ages of eleven through fourteen was for his own sexual gratification. Blair’s inability to accept his behavior for what it was also weighed heavily in the circuit court’s determination of Blair’s lack of candor and level of remorse.
[¶ 51.] The fact that Blair was unable to articulate his reasons led the circuit court to believe that he was not truthful about his motivation for committing the crime, and not candid about his motivation for expressing remorse. The circuit court determined that Blair’s expressions of remorse were insincere and offered only in hopes of securing a lower sentence. The circuit court did not abuse its discretion when it determined the evidence offered at the sentencing hearing did not support Blair’s claimed sense of remorse. Rehabilitation Prospects
[¶ 52.] A defendant’s denial may be considered by a sentencing court as an indicator of whether a defendant can be successfully rehabilitated. McKinney I, 2005 SD 73, ¶ 12, 699 N.W.2d at 476-77. That is because “[rehabilitation must begin with the offender’s acknowledgment of personal fault.” State v. Clegg, 2001 SD 128, ¶ 6, 635 N.W.2d 578, 580. The inability or unwillingness to accept personal responsibility may be considered by a sentencing court as an indicator that a defendant’s rehabilitation prospects are limited. Id.
[¶ 53.] In the instant case, Blair’s inability to accept the seriousness of his conduct was a significant factor in the circuit court’s determination of his rehabilitation prospects. The circuit court noted that without an admission by Blair as to the true nature of his conduct in filming and editing the video, rehabilitation efforts in the short term would prove futile.[14] Blair’s insistence that he did not mastur *69 bate while watching the videotape was not believed by the circuit court, especially given that he had at first admitted that he had done so. The very nature of the videotape as it was edited renders it useless for any legitimate purpose, notwithstanding Blair’s claim that it was done to appease his curiosity. Lacking the ability to admit his growing sexual attraction to young girls in their early teenage years and growing addiction to child pornography, an addiction some of Blair’s relatives acknowledged in their letters of support to the court, the circuit court reasoned Blair would present a danger to the community that rehabilitative efforts would not alleviate in the short term. Therefore, the circuit court elected to give more weight to the penological theory of incapacitation than rehabilitation.[15]

Danger to the Community

[¶ 54.] The circuit court was greatly concerned with the escalation of Blair’s conduct over time. The police reports contained in the pre-sentence investigation report indicated that Blair’s first wife had discovered him peeking through a hole in the wall at two female guests staying at their home while they used the bathroom. After the failure of Blair’s second marriage, it appears that his ability to maintain a relationship with an adult woman was further compromised as his self-esteem plummeted. Blair himself noted that he had not been dating much prior to his arrest. At some point in time, Blair appears to have abandoned attempts at relationships with adult women in favor of videotaping eleven- to fourteen-year-old girls.
[¶ 55.] Curran’s treatment notes indicate she discussed with Blair the growth and escalation of his behavior from videotaping to an attempt at outright physical contact with two of the girls at the sleepover. In response, Blair noted that three years prior to the arrest he would not have thought he would videotape people. Blair conceded that he had grown tired of watching videotaped images and had moved into personal contact and sexual talk with the two girls on the evening of the sleepover.
[¶ 56.] While Blair’s progression from voyeur to child pornographer to attempted child molester may be characterized as slow, nevertheless it was obvious to the circuit court that Blair presented a very real danger to the community.[16] The cir *70 cuit court concluded that the only reason Blair’s conduct did not escalate to an actual attempt at sexual contact appeared to be his arrest.
[¶ 57.] Blair’s explanation for his conduct in his basement with these two young girls rings as hollow as his excuse that his motivation for creating the videotape was mere “curiosity.” Blair offered that these two girls were not even friends of his daughters and that he had “basically found them and invited them to come over .” He also told Curran that his conduct was the result of low self-esteem and a need to be admired. The circuit court did not accept these factors as plausible explanations, and again determined that Blair’s inability to accept his conduct for what it was made him a danger to the community.

Effects of the Crime on the Victims

[¶ 58.] Blair’s argument that his conduct was less severe in nature and therefore deserving of punishment at the lower end of the scale seems to suggest that the circuit court should have taken into account the degree of offensiveness demonstrated by Blair’s taste in child pornography. Blair argues that his offense is deserving of a lesser punishment because no sex act other than masturbation was depicted, and because Blair did not direct the girls to engage in the conduct filmed.[17] However, the statute does not differentiate between the various prohibited sexual acts or rank the acts from severe to less severe and require that punishment be adjusted accordingly.
[¶ 59.] Blair does concede that the content of the videotape met the requirements of SDCL 22-22-23, the crime to which he pleaded guilty. However, despite this concession, Blair reasons his conduct is less deserving of punishment, as his crime only caused his victims humiliation and invaded their privacy. It is important to note that Blair was not charged with window peeking under SDCL 22-21-3, or with a misdemeanor under SDCL 22-21-4 for taking pictures of someone in the nude without their consent.[18] These two crimes more *71 aptly fit the description of a curious “peeping tom” that Blair attempts to give his conduct, and are considered invasion of privacy crimes. Instead, Blair was charged with a sex crime under SDCL 22-22-23 for filming a minor in a prohibited sexual act.
[¶ 60.] It is not just the humiliation and invasion of the girls’ privacy that SDCL 22-22-23 was targeted at preventing as suggested by Blair. The statute sought to protect children from those who photograph or film children engaged in prohibited sexual acts. That is, the statute sought to protect children from those who create child pornography in either still picture or moving film format. Whether the images of the children in question were limited to nudity, or extended to something as heinous as bestiality, the statute sought to protect children from predators who derive their sexual satisfaction from child pornography and those who seek to provide such predators with these images.
[¶ 61.] The circuit court heavily focused its sentencing decision on the effects of Blair’s crimes on the five young girls victimized. The letters from several of the victims indicate the significant psychological harm incurred by the victims. Each of the girls who wrote letters or statements to the circuit court focused on their respective disbelief that a parent could do such a thing to a child. Blair’s daughter wrote that she is unable to understand why her father would treat her in such a manner, and how she is unable to trust people as a consequence. Other victims wrote similar statements, discussing how his acts were a violation of trust each of these girls had in Blair. One of the victims wrote that she at times wondered if she could trust her own father not to do something similar to her.
[¶ 62.] We do not accept Blair’s characterization of the victims’ injuries as humiliation and invasion of privacy caused by learning of the existence of the videotape, or seeing still photographs made from the videotape. Nothing could be further from the true nature of the injuries inflicted upon these young girls, especially Blair’s daughter.[19] These young girls were used and exploited as sex objects by a forty-two year old man. The State’s disclosure of the existence of the videotape to the girls and showing some of them the still photos made from the videotape did not create the injury. The injury was inflicted by Blair’s conduct at the time he surreptitiously filmed the girls and then used those images for his own sexual gratification. At that time, the children were victimized and the elements of the crime completed.
[¶ 63.] Blair was prosecuted for a sex crime, not for humiliating these children, invading their privacy, or causing them to exhibit trust issues. The circuit court understood the distinction and was clearly focused on the injury to the victims as encompassing sexual exploitation when it compared the psychological injuries of a rape victim to the psychological injuries incurred by these young girls.[20]
*72 [¶ 64.] Furthermore, the circuit court was aware of the effects of Blair’s crime on the community and on the victims as evidenced by its memorandum opinion issued after the first sentencing hearing and its opinion issued after conducting the gross disproportionality analysis on remand. “The legislature has determined that a sex crime against a child is a serious concern and one which should be punished severely.” State v. Guthmiller, 2003 SD 83, ¶ 48, 667 N.W.2d 295, 311 (reaffirming that the utmost deference should be given to the Legislature and the sentencing court in cases involving sex crimes against a child, in the context of criminal pedophilia). Given the circuit court’s understanding of the increasing trend of sex crimes against children, and the escalation of conduct often depicted in these types of cases, the circuit court did not err when it placed greater focus on the penological theories of deterrence and incapacitation rather than on rehabilitation.
[¶ 65.] In light of the egregious nature of the offense against at least five girls between the ages of eleven and fourteen, the repeated violations of SDCL 22-22-23 over an eighteen-month period, Blair’s lack of remorse and candor about his own conduct, his attempts to shift the cause of the injury to the state’s attorney, and the severe and long-lasting psychological injuries to his own child and the other child-victims, the sentences imposed were not grossly disproportionate to the crimes committed. Blair was sentenced to eight years for each of the five offenses charged. He was not sentenced to forty years for one felony. The fact that the sentences were imposed consecutively, while harsher than a concurrent sentence, does not make the sentences as a whole disproportionate.
[¶ 66.] The record clearly establishes that in the minds of each of these five girls the crimes were individual and specific to each of them and the emotional and psychological damages sustained by each was unique and individual. The circuit court was well within its discretion to hold Blair separately accountable for the crimes committed against each of the five victims of his crimes by imposing consecutive sentences. The circuit court justly concluded that concurrent sentencing would not accomplish justice for each of the five children victimized by Blair. Separate crimes committed against separate victims justified separate, that is, consecutive sentencing.
[¶ 67.] With the full record now before us we are able to discern the nature of Blair’s character, his conduct, and its effect on the victims as determined by the circuit court. This is without a doubt the most serious violation of SDCL 22-22-23 in South Dakota, in that the videotape contained evidence of at least fifty separate violations against five different victims. The combination of the severity of the offense, the effects of the crime on the victims, and Blair’s limited rehabilitation prospects justify a sentence at the harsher end of the spectrum. Based on the record as a whole, the five eight-year consecutive sentences, while harsh, do not appear grossly disproportionate and therefore do not violate the Eighth Amendment prohi *73 bition against cruel and unusual punishment. Therefore, we decline to review the intra-jurisdictional analysis offered by Blair on appeal.
[¶ 68.] Affirmed.
[¶ 69.] ZINTER, Justice, concurs.
[¶ 70.] KONENKAMP, Justice, concurs in result.
[¶ 71.] SABERS and MEIERHENRY, Justices, dissent.

. The girls became suspicious that Blair was filming them in the bathroom after he placed a video camera on a shelf in the bathroom and told the girls not to touch it as it was recharging.

. Blair denies he exposed himself to the two girls during the conversation. However, both girls described the event at two different interviews and maintained that Blair exposed his penis during the conversation.

. The VHS videotape discovered is highly edited. The images suggest that the original footage was shot on other tapes and then edited onto the videotape discovered in Blair’s home. An eight millimeter video camera was discovered in Blair's home during the search and is believed to be the camera utilized by Blair to shoot the original footage. However, the original tapes shot by Blair were never recovered by law enforcement.

. Blair disavowed any knowledge of these images, stating that he had purchased a box of computer disks at a garage sale and was not aware of the images on one of the disks. He further stated that he subsequently discovered the disks were insufficient for his data storage needs and he never used any of the disks.

. Prior to its repeal, SDCL 22-22-23.1 provided:
Any person who knowingly possesses any book, magazine, pamphlet, slide, photograph, or film depicting a minor under the age of eighteen years engaging in a prohibited sexual act or in the simulation of such act or whose knowing possession encourages, aids, abets, or entices any person to commit a "prohibited sexual act" is guilty of a Class 6 felony.
(repealed by S.D. S.L. 2002, ch. 109, § 1). As a Class 6 felony, a conviction could result in a maximum sentence of two years in the state penitentiary. SDCL 22-6-1.

. Pennington County file number 01-832. In State v. Spack, the defendant was charged with twenty counts of third degree rape of his fiancée’s thirteen-year-old daughter, nine counts of possession of child pornography under SDCL 22-22-23.1, and nine counts of filming a minor in a prohibited sexual act under 22-22-23. The defendant in that case engaged in sexual relations with the victim over a three-year period of time. The photographing charges were based on the fact that the defendant photographed the girl while she performing fellatio on him. Under a plea agreement, the defendant was sentenced on two counts of rape in the third degree to two terms of twenty years to be served consecutively. In addition, the defendant was sentenced on two counts of filming a minor in a prohibited sexual act to two ten-year terms to be served concurrently with his rape sentences.

. In Stahl, the defendant was convicted of possession of marijuana, distribution of marijuana and distribution of marijuana in drug-free zone, a total of four felony counts, and received a twenty-four year prison sentence. 2000 SD 154, ¶ 3, 619 N.W.2d at 871.
In his pre-sentence report statement, Stahl proclaimed his only crime was in caring too much and helping his fellow man and that he was innocent of the charges. He claimed he did not possess or distribute marijuana at any time, yet alone in a drug-free zone, despite the taped recordings documenting both drug sales and the jury's *61 determination that he did commit these crimes.
Id. ¶ 7, 619 N.W.2d at 872. The circuit court viewed this as a lack of remorse and considered it heavily when it imposed the sentence. On appeal the sentence was affirmed, and this Court held that a defendant's lack of remorse is appropriately considered by a sentencing court. Id. (citing Ganrude V. Weber, 2000 SD 96, ¶ 12, 614 N.W.2d 807, 810; State v. Chase in Winter, 534 N.W.2d 350, 355 (S.D.1995)).

. While the crime in question in Bonner, 1998 SD 30, ¶ 28, 577 N.W.2d at 583, was statutory-rape, circuit court dockets in South Dakota do not lack for child pornography cases and other sexual crimes perpetrated against children as evidenced by this Court's recent case load. See State v. Helland, 2005 SD 121, 707 N.W.2d 262 (intermediate appeal of charges under SDCL 22-22-24); McKinney II, 2005 SD 74, 699 N.W.2d 460 (prosecuted under SDCL 22-22-24); State v. Martin, 2003 SD 153, 674 N.W.2d 291 (prosecuted under SDCL 22-22-24); and State v. Christensen, 2003 SD 64, 663 N.W.2d 691 (prosecuted under SDCL 22-22-23.1 (repealed by S.L. 2002, ch. 109, § 3)).

. See SDCL 22-22-1(1) (defining the sexual penetration of a victim less than thirteen years of age as rape); SDCL 22-22-1.2 (imposing minimum sentences for rape or sexual contact with a child); SDCL 22-22-7 (defining when sexual contact with a child under sixteen is a felony or a misdemeanor); SDCL 22-22-7.3 (defining sexual contact with a child under sixteen by another person younger than sixteen as a misdemeanor); SDCL 22-22-7.5 (defining safety zone for child victims of sex crimes); SDCL 22-24A-1 (making the sale of child pornography a felony); SDCL 22-24A-3 (defining the possession, manufacture or distribution of child pornography as a felony); SDCL 22-22-24.3 (criminalizing and defining sexual exploitation of a minor as a felony); SDCL 22-24A-5 (criminalizing the solicitation of a minor for purposes of engaging in a prohibited sexual act).

.We recognize that the statutory scheme was significantly altered in 2002 when SDCL 22-22-22 was repealed. However, the language of SDCL 22-24A-2 would still encompass the conduct for which Blair was convicted:
"Prohibited sexual act,” actual or simulated sexual intercourse, sadism, masochism, sexual bestiality, incest, masturbation, or sadomasochistic abuse; actual or simulated exhibition of the genitals, the pubic or rectal area, or the bare feminine breasts, in a lewd or lascivious manner; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either *63 party; defecation or urination for the purpose of creating sexual excitement in the viewer; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed. The term includes encouraging, aiding, abetting or enticing any person to commit any such acts as provided in this subdivision. The term does not include a mother’s breastfeeding of her baby[.] (emphasis added).

. Blair’s prior criminal record at the time of the sentencing hearing included misdemeanor convictions for disorderly conduct, three convictions for insufficient funds checks less than one hundred dollars, a conviction for driving while intoxicated, and a violation of a boating regulation.

. In Wiedmann v. Merillat Indust., we described the MMPI, or Minnesota Multi-Phasic Personality Inventory:
The test is a standard objective psychological battery consisting of 550-566 true-false questions concerning behavior, feelings, social attitudes, and frank symptoms of psychopathology. To each question, the subject must answer true, false or cannot say. The subject's answer sheet is then scored by various keys that have been standardized on different diagnostic groups and personality types. Sloane Dorland Annotated Medical-Legal Dictionary 717 (1987); Psychiatric Dictionary 640 (5th ed. 1981).
2001 SD 23, ¶ 6 n. 2, 623 N.W.2d 43, 45 n. 2 (quoting Johnson v. Albertson’s, 2000 SD 47, ¶ 14, 610 N.W.2d 449, 452 n. 6).

. Paraphilia is defined as “the preference for or addiction to unusual sexual practices.” Webster’s Third New International Dictionary 1638 (1976).

. This Court in McKinney I, 2005 SD 73, ¶ 15, 699 N.W.2d at 477, upheld the trial court's finding that prospects for rehabilitation and sex offender treatment were poor due to the defendant's continued denial of misconduct, this despite a score in the low to moderate range to re-offend.

. The Eighth Amendment does not mandate the adoption of any one penological scheme. Harmelin, 501 U.S. at 999, 111 S.Ct. at 2704, 115 L.Ed.2d 836. Penological schemes may be based on different theories, including retribution, deterrence, incapacitation or rehabilitation, as long as a sentence is not grossly disproportionate. Id.

. No empirical studies exist that quantify the number of child pornographers that escalate to predatory physical conduct. However, profiles of cases and Federal Bureau of Investigation “studies of sexual offenders indicate a correlation between the viewing and collection of child pornography materials and the subsequent commission of crimes.” Michael K. Wegner, Teaching Old Dogs New Tricks: Why Traditional Free Speech Doctrine Supports Anti-Child-Pornography Regulations in Virtual Reality, 85 Minn.L.Rev. 2081, 2094, n. 69-71 (2001) (citing Child Pornography Prevention Act of 1995: Hearing Before the Senate Comm, on the Judiciary, 104th Cong. 35 (1996) (statement of Professor Victor Cline) (testifying as "a clinical psychologist specializing in the treatment of sexual compulsions” and noting "that the overwhelming majority of the pedophiles he treats use child pornography and/or create it to stimulate and whet their sexual appetites which they masturbate to, then later use as a model for their own sexual acting-out with children’ ” and that “he had seen numerous cases where pedophiles used the pornographic material to seduce children into engaging in sexual acts”)); United States Department of Justice Office of Juvenile and Delinquency Prevention, Use of *70 Computers in the Sexual Exploitation of Children 3 (1999) (“describing use of child pornography as a characteristic of preferential sex offenders for law enforcement purposes”); National Center for Missing and Exploited Children, Child Molesters Who Abduct: Summary of the Case in Point Series (1995) ("detailing numerous cases of convicted child molesters and abductors who used various forms of child pornography as a means of stimulation of their own sexual desires before committing sexual crimes against children”).

. As noted by Justice Blackmun in his concurrence in Ferber, “a 12-year-old child photographed while masturbating surely suffers the same psychological harm whether the community labels the photograph 'edifying' or ‘tasteless.’ The audience’s appreciation of the depiction is simply irrelevant to [the State’s] asserted interest in protecting children from psychological, emotional, and mental harm.” 458 U.S. at 774-75, 102 S.Ct. at 3364, 73 L.Ed.2d 1113 (Blackmun, J., concurring).

. SDCL 22-21-3 provides: "No person may enter the private property of another and peek in the door or window of any inhabited building or structure located thereon, without having lawful purpose with the owner or occupant thereof. A violation of this section is a Class 1 misdemeanor.”
SDCL 22-21-4 provides:
No person may use a concealed camcorder, motion picture camera, or photographic camera of any type, to secretly videotape, film, photograph, or record by electronic means, any other person without clothing, or any other person under or through the clothing being worn by that other person, for the purpose of viewing the body of, or the undergarments worn by, that other person, without the consent or knowledge of that other person, with the intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of that person and invade the privacy of that other person, under circumstances in which the other person has a reasonable expectation of *71 privacy. A violation of this section is a Class 1 misdemeanor.

. Blair continues to deny any sexual attraction to his daughter. Even if the circuit court had accepted that statement as truth, it does not negate the fact that Blair appears to have used his daughter as a “stalking horse” in order to gain access to her friends.

. Blair’s daughter wrote a letter to the circuit court prior to the sentencing hearing. It stated in part:
Just being reminded of what my dad has done to me has some days made me question if there really was any reason to get out of bed in the morning. I just didn't want to live anymore.... The more I think about it the more I have realized I don't think of him as my dad because real Fathers don’t hurt their children like this.
*72 A letter to the court authored by one of the victims was read into the record at the sentencing hearing by her mother. It stated in part:
I don't know where to start. I feel like my trust has been violated. I feel like I lost my identity. I [have] even come to think that I can’t trust my own father.... It took everything to come here today to even face this man, to get up here and say what he did to me was wrong. Now I'm thinking about how he pictures me in his head. I was outraged, sad, frightened, all at the same time when I found out. I am scared to trust anyone.... I felt like dying when I found out.